24-70002

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

AMOS J. WELLS III,

*Petitioner-Appellant,*

v.

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS
DIVISION,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, No. 4:21-cv-01384-O

## PETITIONER-APPELLANT'S MOTION FOR A CERTIFICATE OF
## APPEALABILITY AND INCORPORATED BRIEF IN SUPPORT

Elizabeth M. Wright
COOLEY LLP
500 Boylston St.
Boston, MA 02116
(617) 937-2300

Matthew L. Kutcher
COOLEY LLP
110 N. Wacker Dr.
Chicago, IL 60606
(312) 881-6500

Ginger D. Anders
Xiaonan April Hu
Andra Lim
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
  Suite 500E
Washington, DC 20001
(202) 220-1100
Ginger.Anders@mto.com

*Counsel for Petitioner-Appellant*
(additional counsel on inside cover)

William S. Harris
THE LAW OFFICE OF WILLIAM S. HARRIS
604 E. 4th St., Suite 101
Fort Worth, TX 76102
(817) 718-7060

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Petitioner-Appellant:**  Amos J. Wells III.

**Counsel for Petitioner-Appellant:**  Ginger D. Anders, Xiaonan April Hu, Andra Lim, and Kyle Schneider of Munger, Tolles & Olson LLP; Shamis Beckley, Elizabeth M. Wright, Hanna Evensen, Matthew L. Kutcher, Mariah Young, Alessandra Rafalson, Alexandra Cubaleski, Ann Jacob, and Khary Anderson of Cooley LLP; William S. Harris of The Law Office of William S. Harris; and Drew Wegner of Cohen Dowd Quigley P.C.

**Respondent-Appellee:**  Bobby Lumpkin, Director, Texas Department of Criminal Justice, Correctional Institutions Division.

**Counsel for Respondent-Appellee:**  Jefferson David Clendenin, Office of the Attorney General.

Date: May 17, 2024

Respectfully Submitted,

*s/ Ginger D. Anders*

Ginger D. Anders

MUNGER, TOLLES & OLSON LLP

601 Massachusetts Ave., NW
  Suite 500E

Washington, DC 20001

(202) 220-1100

Ginger.Anders@mto.com

**STATEMENT REGARDING ORAL ARGUMENT**

Petitioner-Appellant Amos J. Wells III requests oral argument, as he believes argument would significantly aid the decisional process in this case.

## STATEMENT REGARDING OPPOSITION

Pursuant to Rule 27.4, counsel for Wells has contacted other parties, and an opposition will be filed.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

STATEMENT REGARDING ORAL ARGUMENT...............................................iii

STATEMENT REGARDING OPPOSITION ........................................................ iv

TABLE OF CONTENTS .....................................................................................v

TABLE OF AUTHORITIES ............................................................................ vii

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT ......................................................................3

ISSUES PRESENTED FOR REVIEW .................................................................4

STATEMENT OF THE CASE..............................................................................5

I.     TRIAL AND DIRECT REVIEW...............................................................5

II.    STATE POST-CONVICTION PROCEEDINGS .......................................15

III.   FEDERAL HABEAS PROCEEDINGS.....................................................16

SUMMARY OF ARGUMENT ...........................................................................18

STANDARD OF REVIEW ................................................................................21

ARGUMENT .....................................................................................................22

I.     A COA SHOULD ISSUE ON WHETHER TRIAL COUNSEL
       WERE INEFFECTIVE BY PRESENTING TESTIMONY THAT
       WELLS WAS GENETICALLY PREDISPOSED TOWARD
       VIOLENT CONDUCT..............................................................................22

       A.     Presenting the Violence-Genetics Theory Established Wells'
              Future Dangerousness, Thereby Relieving the Prosecution of Its
              Burden to Prove that Special Issue.................................................23

       B.     Trial Counsel Performed Deficiently By Presenting Evidence
              that Established Wells' Future Dangerousness. ...............................25

       C.     Trial Counsel Also Performed Deficiently By Inviting the Jury
              to Sentence Wells to Death Based on an Irrelevant Immutable
              Characteristic.................................................................................31

       D.     The Presentation of the Violence-Genetics Theory Prejudiced
              Wells.............................................................................................35

II.    A COA SHOULD ISSUE WITH RESPECT TO WHETHER THE EIGHTH AMENDMENT REQUIRED ADMISSION OF THE POWERFUL REMORSE EVIDENCE CONTAINED IN THE CUSTODIAL VIDEOTAPE. ........................................................38

    A.    The Trial Court's Exclusion of the Tape Violated Wells' Eighth Amendment Rights. ..............................................................39

    B.    The Video's Exclusion Was Not Harmless. ........................................43

    C.    The State Court's Finding of Procedural Default Does Not Provide an Adequate and Independent State Ground. ........................45

III.   A COA SHOULD ISSUE WITH RESPECT TO WHETHER APPELLATE COUNSEL WAS INEFFECTIVE IN FAILING TO CHALLENGE THE EXCLUSION OF THE JAILHOUSE INTERVIEW VIDEOS. ................................................................49

IV.    A COA SHOULD ISSUE ON WHETHER TRIAL COUNSEL WERE DEFICIENT BY PREVENTING THE EXCUSAL OF A JUROR WHO BELIEVED THAT THE DEATH PENALTY SHOULD BE MANDATORY FOR MURDER. .........................................52

    A.    Trial Counsel's Decision to Permit the Seating of Hakizimana Was Objectively Unreasonable. ..........................................53

    B.    Wells Was Prejudiced By Trial Counsel's Failure to Strike Hakizimana. ...............................................................56

CONCLUSION ...............................................................58

CERTIFICATE OF SERVICE ...........................................59

CERTIFICATE OF COMPLIANCE ....................................60

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Bouie v. City of Columbia,*
    378 U.S. 347 (1964) ........................................................................49

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) ........................................................................43

*Brown v. Davenport,*
    142 S. Ct. 1510 (2022) ....................................................................43

*Brown v. Payton,*
    544 U.S. 133 (2005) ........................................................................43

*Buck v. Davis,*
    580 U.S. 100 (2017) ..................................................................*passim*

*Canales v. Davis,*
    966 F.3d 409 (5th Cir. 2020) ..........................................................39

*Chapman v. California,*
    386 U.S. 18 (1967) ..........................................................................43

*Cruz v. Arizona,*
    598 U.S. 17 (2023) ..........................................................................46

*Eddings v. Oklahoma,*
    455 U.S. 104 (1982) ........................................................................39

*Florida v. Nixon,*
    543 U.S. 175 (2004) ..........................................................26, 30, 34

*Garza v. Stephens,*
    738 F.3d 669 (5th Cir. 2013) ..........................................................21

*Green v. Georgia,*
    442 U.S. 95 (1979) ........................................20, 41, 42, 50, 51

*Haynes v. Cain,*
    272 F.3d 757 (5th Cir. 2001) ..........................................................26

Page(s)

*Johnson v. Mississippi*,
    486 U.S. 578 (1988)..................................................................32

*Lee v. Kemna*,
    534 U.S. 362 (2002)............................................................46, 49

*Littlejohn v. Royal*,
    875 F.3d 548 (10th Cir. 2017) ..............................................28

*Lockett v. Ohio*,
    438 U.S. 586 (1978)..................................................................39

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003)..................................................................21

*Morgan v. Illinois*,
    504 U.S. 719 (1992)...................................................3, 53, 54, 57

*Murphy v. Davis*,
    901 F.3d 578 (5th Cir. 2018) ................................................32

*NAACP v. State of Ala. ex rel. Patterson*,
    357 U.S. 449 (1958)..................................................................49

*Nelson v. Quarterman*,
    472 F.3d 287 (5th Cir. 2006) ................................................39

*Rhoades v. Davis*,
    914 F.3d 357 (5th Cir. 2019) ................................................44

*Riggins v. Nevada*,
    504 U.S. 127 (1992)..................................................................43

*Rocha v. Thaler*,
    626 F.3d 815 (5th Cir. 2010) ................................................46

*Romano v. Oklahoma*,
    512 U.S. 1 (1994)................................................................33, 34

**Page(s)**

*Rompilla v. Beard*,
     545 U.S. 374 (2005)...................................................................................29

*Scheanette v. Quarterman*,
     482 F.3d 815 (5th Cir. 2007) .................................................................46

*Sears v. Upton*,
     561 U.S. 945 (2010)...................................................................................42

*Simmons v. Epps*,
     654 F.3d 526 (5th Cir. 2011) .................................................................51

*Simmons v. South Carolina*,
     512 U.S. 154 (1994)...................................................................................45

*Strickland v. Washington*,
     466 U.S. 668 (1984)..........................................................................*passim*

*Virgil v. Dretke*,
     446 F.3d 598 (5th Cir. 2006) .................................................53, 54, 56

*Turner v. Murray*,
     476 U.S. 28 (1986).....................................................................................29

*United States v. Cossey*,
     632 F.3d 82 (2d Cir. 2011) .....................................................................33

*United States v. Kadlec*,
     22 M.J. 571 (A.C.M.R. 1986)...............................................................26

*United States v. Washington*,
     417 F.3d 780 (7th Cir. 2005) .................................................................42

*Wiggins v. Smith*,
     539 U.S. 510 (2003)...........................................................................34, 37

*Williams v. Taylor*,
     529 U.S. 362 (2000)...........................................................................39, 41

Page(s)

*Wilson v. Sirmons*,
    536 F.3d 1064 (10th Cir. 2008) .......................................................37

*Woodson v. North Carolina*,
    428 U.S. 280 (1976).........................................................................39

*Zant v. Stephens*,
    462 U.S. 862 (1983).............................................................32, 33, 34

**STATE CASES**

*Clarke v. State*,
    270 S.W.3d 573 (Tex. Crim. App. 2008) ...................................47, 48

*Ex parte Wells*,
    No. WR-86,184-01, 2021 WL 5917724 (Tex. Crim. App. Dec. 15,
    2021), *cert. denied sub nom.*, *Wells v. Texas*, 142 S. Ct. 2722
    (2022) ..............................................................................16, 50, 52

*Ford v. State*,
    305 S.W.3d 530 (Tex. Crim. App. 2009) ...................................47, 49

*Hardie v. State*,
    807 S.W.2d 319 (Tex. Crim. App. 1991) ...................................48, 49

*Hughes v. State*,
    878 S.W.2d 142 (Tex. Crim. App. 1992) .........................................24

*Keeter v. State*,
    175 S.W.3d 756 (Tex. Crim. App. 2005) .........................................47

*Lankston v. State*,
    827 S.W.2d 907 (Tex. Crim. App. 1992) .........................................47

*Layton v. State*,
    280 S.W.3d 235 (Tex. Crim. App. 2009) .........................................47

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Mobley v. State*,
    265 Ga. 292 (1995) ........................................................................31

*Montgomery v. State*,
    810 S.W.2d 372 (Tex. Crim. App. 1990) ...........................................48

*Rivas v. State*,
    275 S.W.3d 880 (Tex. Crim. App. 2009) ...........................................48

*Wells v. State*,
    611 S.W.3d 396 (Tex. Crim. App. 2020) ...................................*passim*

**FEDERAL STATUTES**

28 U.S.C. § 2241(d) ..........................................................................3

28 U.S.C. § 2253 ..............................................................................4

28 U.S.C. § 2253(c)(2) .....................................................................21

28 U.S.C. § 2254 ..............................................................................3

28 U.S.C. § 2254(d) ........................................................................43

28 U.S.C. § 2254(d)(1) ....................................................................21

**STATE STATUTES**

Tex. Code Crim. Proc. art. 35.15 ........................................................8

Tex. Code Crim. Proc. art. 37.071 ......................................................8

**FEDERAL RULES**

Fed. R. Civ. Proc. 59(e) ................................................................4, 18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Fed. R. Evid. 606(b) ................................................................57

**STATE RULES**

Tex. R. App. P. 33.1 ...................................................46, 48, 49

Tex. R. App. P. 33.1(a) .........................................................46

**OTHER AUTHORITIES**

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.10.2(B), 31 Hofstra L. Rev. 913 (2003) ............................................................54

**INTRODUCTION**

Amos Wells was sentenced to death after penalty-phase proceedings in which his own counsel presented expert testimony that Wells' genetic makeup predisposed him to future violence; the trial court excluded compelling mitigating evidence showing Wells' deep remorse in the immediate aftermath of his offense; and counsel failed to strike a juror who repeatedly opined that a death sentence should be automatic upon a conviction for murder. The Texas Court of Criminal Appeals (TCCA) rejected Wells' ineffective-assistance and Eighth Amendment claims based on these errors. On federal habeas, the district court rejected them as well, and denied a Certificate of Appealability (COA). That decision is erroneous in numerous respects, and at a minimum, reasonable jurists could debate its correctness. This Court should issue a COA on each of these issues.

*First*, trial counsel rendered ineffective assistance by presenting expert "violence genetics" testimony asserting that *32%* of people like Wells go on to commit violent offenses, and that Wells himself would have difficulty avoiding violence in the future. That evidence was itself sufficient to establish one of the two prerequisites to the death penalty under Texas law: that Wells was likely to be dangerous in the future. The prosecution took full advantage, repeating over and over to the jury that the *defense's own experts* had conceded future dangerousness. The testimony therefore likely carried enormous weight with the jury, as the

1

Supreme Court has recognized in materially similar circumstances. *Buck v. Davis*, 580 U.S. 100 (2017). The TCCA and the district court below nonetheless rejected Wells' ineffective-assistance claim, characterizing defense counsel's introduction of the testimony as a reasonable strategic judgment. That cannot be right. The testimony portrayed Wells as incorrigible and unable to control his violent impulses, it had no mitigating value, and it was scientifically baseless.

*Second*, the trial court violated Wells' Eighth Amendment right to present relevant, reliable mitigating evidence by excluding a video of Wells' actions while in custody after turning himself in. That video was compelling visual evidence of Wells' remorse—and therefore would have been powerful mitigating evidence. Once again, the prosecution took full advantage, emphasizing to the jury that Wells had not shown remorse in the courtroom. Particularly when combined with defense counsel's argument that Wells was genetically predisposed to violence, the exclusion of the remorse evidence meant the jury was left with the incorrect impression that Wells was remorseless and irretrievably violent, and would remain so in prison.

*Third*, appellate counsel was ineffective in failing to challenge the exclusion of three media-interview videos in which Wells, being interviewed by local broadcasting stations on the day after the offense, tearfully expressed his deep

remorse. Those videos would have been powerful mitigating evidence for the same reasons as the custodial video.

*Fourth*, trial counsel was ineffective in failing to strike a juror who repeatedly stated that a death sentence should automatically follow a murder conviction. Although the juror also made more equivocal statements during *voir dire*, he ultimately returned to his baseline belief that death should be automatic. He was thus unconstitutionally biased under *Morgan v. Illinois*, 504 U.S. 719 (1992), and his seating as a juror necessarily prejudiced Wells.

All told, Wells was sentenced to death after a proceeding in which the adversary process fell far short of constitutional standards. His own defense counsel established part of the prosecution's case for death, while his ability to present a mitigation case was badly undermined by both the "violence genetics" theory and the exclusion of the remorse evidence. In those circumstances, the death sentence cannot be considered constitutionally reliable. This Court should issue a COA.

## JURISDICTIONAL STATEMENT

Wells was sentenced to death on November 18, 2016, in the 432nd District Court of Tarrant County, Texas. ROA.5860-5861. On December 13, 2022, Wells filed a petition for writ of habeas corpus in the district court under 28 U.S.C. §§ 2241(d) and 2254. ROA.124. On March 20, 2023, Wells filed an amended petition for writ of habeas corpus. ROA.517. The district court denied the amended

3

petition and a COA on November 2, 2023.  ROA.1175.  On November 30, 2023, Wells filed a motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e).  ROA.1240.  The district court denied the motion on January 5, 2024.  ROA.1320.  Wells timely filed a notice of appeal on February 2, 2024. ROA.1335.  The Court has jurisdiction under 28 U.S.C. § 2253 to consider Wells' motion for a COA.

## ISSUES PRESENTED FOR REVIEW

**1.**     Whether a COA should issue on Wells' claim that trial counsel rendered ineffective assistance by presenting expert testimony that he was genetically predisposed to be violent.

**2.**     Whether a COA should issue on Wells' claim that the trial court violated his Eighth Amendment right to present mitigation evidence by excluding powerful and contemporaneous evidence of Wells' remorse, specifically, an eight-hour video of Wells' behavior while in custody immediately following the offense.

**3.**      Whether a COA should issue on Wells' claim that appellate counsel rendered ineffective assistance by failing to argue that the trial court violated his Eighth Amendment right to present mitigation evidence by excluding videos of media interviews in which Wells expressed his remorse.

**4.** Whether a COA should issue on Wells' claim that trial counsel rendered ineffective assistance by failing to strike a juror who believed that the death penalty should be mandatory for murder.

## STATEMENT OF THE CASE

### I.    TRIAL AND DIRECT REVIEW

**1.** On July 1, 2013, Wells became upset with Chanice Reed, his pregnant girlfriend. ROA.13591-13592. Wells drove to the house in Fort Worth where Reed lived. *Wells v. State*, 611 S.W.3d 396, 402 (Tex. Crim. App. 2020). Once there, Wells argued with Reed and her mother. ROA.13596-13599. Ultimately, Wells shot and killed Reed, her mother, and her ten-year-old brother. *Wells*, 611 S.W.3d at 402-03.

An hour later, Wells turned himself in and told police, "Put me in jail; kill me." *Id.* at 404. Wells was placed into custody at the Fort Worth Police Department. *Id.* He ultimately confessed to killing Reed, her mother, and her younger brother. *Id.* at 405.

Wells' initial custody and interrogation was video-recorded in an eight-hour taping. ROA.13489-13490. The video shows Wells sobbing and apologizing when informed by a detective that all three victims had died. Def. Tr. Ex. 81 at 4:34:27-4:35:17. Wells tells the detective, "I should have just shot myself" and "I deserve [the death penalty] . . . I still shouldn't have done it." *Id.* at 4:59:50, 5:04:40-5:05:08.

Not long after, Wells was interviewed in jail by several local TV stations. ROA.13502; *see also* Def. Tr. Ex. 82A, 83A, 84A. A seven-minute unedited video of the interview filmed by one station shows Wells crying and expressing remorse. Def. Tr. Ex. 84A. Wells told reporters that "[t]here's no reason why it should've happened. And [there's] no explanation that I could give anyone or anybody could give anyone to try to make it right or make it seem rational, to make everybody understand." *Id.* at 2:17-2:22. Wells stated that he was "truly sorry" for what happened. *Id.* at 3:22.

Wells was charged with capital murder. ROA.5115. The trial court appointed William Ray and Stephen Gordon to represent Wells. ROA.5137-5141.

**2.**     Jury *voir dire* took place in fall 2016. ROA.6956. On September 19, 2016, the State and defense counsel questioned Abdu Hakizimana, a prospective juror who spoke limited English and had resided in the United States for approximately seven years. ROA.8078-8080, ROA.8109; SEALED Dkt. 78-11 at 423. Hakizimana wrote in his juror questionnaire that he favored the death penalty "because if someone kills people he/she *must* be killed too." SEALED Dkt. 78-11 at 425 (emphasis added). When questioned during *voir dire*, Hakizimana stated that if "there's evidence" the defendant killed two people, he or she should "*always* receive the death penalty for that." ROA.8106 (emphasis added). He also testified

that his comprehension of the proceedings was only "[s]o so." ROA.8080, ROA.8105.

Whether because of his preexisting views or because of his limited English capabilities, Hakizimana expressed doubt about whether he understood the role of mitigation evidence throughout *voir dire*. ROA.8098-8100. Hakizimana eventually stated that he would "try" to hear the mitigation evidence before making his mind up. ROA.8101.

The State sought to exclude Hakizimana based on his family obligations, but defense counsel opposed that request. ROA.8102-8104.

In follow-up questioning, Hakizimana continued to assert that he would "always vote so [the defendant] should get the death penalty" if the defendant had committed murder. ROA.8106. He later allowed that if a sentence of life imprisonment meant solitary confinement for life—which it does not—he might be able to vote for life but emphasized that if a defendant would be held with other prisoners, he would "maybe" "always answer the questions so that someone would die." ROA.8112. In response to leading questions from defense counsel, Hakizimana testified that he could answer "the mitigation question" "yes or no," ROA.8118, but he also gave the opposite answer in the same colloquy, ROA.8126.

Defense counsel did not challenge Hakizimana for cause or use a peremptory strike to exclude him from the jury, and Hakizimana was seated as a juror.

7

ROA.16794, ROA.8127-8128, ROA.11050, ROA.11079. Defense counsel concluded *voir dire* having used only eleven out of their fifteen peremptory strikes. ROA.11045, ROA.11057; *see also* Tex. Code Crim. Proc. art. 35.15.

On November 3, 2016, the jury found Wells guilty of capital murder. ROA.5810.

**3.** The penalty phase of Wells' trial followed. Under Texas law, the jury had to answer two special issues to decide whether Wells would receive the death penalty. First, the jury was to consider whether the prosecution had proven beyond a reasonable doubt that there was a "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 §§ 2(b)(1), (c). Second, if the jury answered "yes" to the first special issue, it was to consider whether there was a "sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." *Id.* art. 37.071 § 2(e)(1). Wells could be sentenced to death only if the jury unanimously answered "yes" to the first and "no" to the second. *Id.* art. 37.071 § 2(d)(2), (f)(2).

**a.** Defense counsel's mitigation case centered on expert testimony that Wells' genetics purportedly predisposed him toward violence. Counsel presented testimony on this "violence genetics" theory through psychiatrist Dr. William Bernet. ROA.12802; *see also* ROA.12825.

8

Bernet testified that Wells had a "poorly functioning" Monoamine Oxidase A (MAOA) gene. ROA.13033, ROA.13073. That defective gene, combined with Wells' adverse experiences during his childhood, "increased the probability that he would act in a violent" manner. ROA.13076. Bernet testified that a landmark study showed that *32%* of children who were maltreated and had the defective gene "had been convicted of a violent crime." ROA.13057. Bernet further opined that Wells was "*four and a half times* more likely" than "a typical person" to engage in violence in the future. ROA.13077-13078 (emphasis added). Bernet told the jury that the science underlying the violence-genetics theory was "valid," ROA.13020, even though the "scientific community[]" had "serious and widespread doubts about" the relevant studies' validity, ROA.15138.

The State—no doubt recognizing the power of Bernet's testimony in establishing future dangerousness—took full advantage of that testimony. The State told the jury that the testimony conceded that there was a probability that Wells would commit violent crimes in the future, thus establishing the first prerequisite for the death penalty. In closing arguments, the State repeatedly emphasized that point, urging the jury that "this is the easy answer, and they *conceded it through all their experts*," particularly Bernet. ROA.13793 (emphasis added); *see also* ROA.13751, ROA.13791. Besides Bernet's testimony (and other defense expert testimony corroborating his), the prosecution's only other evidence of future dangerousness

was the murders Wells had just been convicted of; violence toward a prior romantic partner; and one in-prison incident.  ROA.13745-13751.

Defense counsel attempted to use Bernet's testimony in mitigation, arguing that Wells should not be put to death because he was violent for reasons beyond his control.  Bernet testified that people with the defective MAOA gene and adverse childhood experiences have a "harder" time "control[ling] anger."  ROA.13044.  Wells, for instance, had "many times" gotten "very angry, out of control," which "indicate[d] that this gene-environment interaction was happening all through his childhood and his adolescence and his young adulthood."  ROA.13075.

Counsel also presented mitigating evidence about Wells' difficult childhood through Wells himself, family members, and multiple experts.  Among other things, witnesses testified that Wells frequently witnessed domestic violence and was abandoned by his father.  *See, e.g.*, ROA.13329 (expert testimony describing "complex developmental trauma, which is sort of like childhood posttraumatic stress disorder, but it's more toxic").

This effort to highlight Wells' childhood mistreatment was, however, undermined by Bernet's testimony.  Bernet testified that his violence-genetics theory depended on the proposition that Wells had experienced only *moderately* adverse childhood experiences.  Children who are extremely abused, Bernet explained, would experience problems regardless of whether they have a defective MAOA

10

gene. ROA.13045. Bernet therefore emphasized that Wells had—at most—experienced only the "middle range" of childhood maltreatment. ROA.13045. And under one prominent study's definition of maltreatment, Bernet explained, Wells had not experienced maltreatment at all. ROA.13084.

Once again, the State took advantage, emphasizing in closing Bernet's admission that Wells "would not have been considered to have . . . severe childhood mistreatment." ROA.13754; *see also* ROA.13799.

**b.** As part of the mitigation case, trial counsel also attempted to introduce evidence of Wells' remorse in the immediate aftermath of the murders through several videotapes, which the trial court excluded. These videos consist of (1) an eight-hour long Fort Worth Police Department surveillance video taken of the interrogation room where Wells was held overnight on the day of the murder, ROA.13489; and (2) three jailhouse interview videos with Wells taken by various local television stations the day after the murder, ROA.13501-13504.

Each of these videos includes powerful visual evidence of Wells' remorse. The police surveillance video, which was taken a few hours after the murders, captures an interrogation between Wells and Detective Matthew Barron, during which Wells repeatedly cries, apologizes, and expresses remorse for his conduct. Def. Tr. Ex. 81 (Interrogation Video) at 4:32:27-4:33:17, 4:59:50-5:00:00. Among other statements, Wells tells Detective Barron, "I should have just shot myself" and

"I deserve [the death penalty]." *Id.* at 4:59:50, 5:04:40-5:05:08. Video stills from the interrogation show Wells alternating between wiping away his tears and putting his head in his hands despondently. Towards the end of the interrogation, Wells asks Detective Barron for a hug and receives one. *Id.* at 5:14:55. Apart from the interrogation, the video also shows Wells talking to himself and expressing disbelief and dismay while alone. He appears visibly disoriented and distressed, at varying times staring at and touching the wall, and other times trying to convince himself everything is a dream. *Id.* at 20:20:00-20:20:40, 20:23:10-20:25:30, 20:25:40-20:25:50.

The jailhouse interview videos consist of a seven-minute long, unedited recording of Wells speaking to reporters from jail and two edited videos derived from the first. The "uncut" video shows Wells crying and expressing remorse. Voice audibly cracking, Wells tells the reporters that he turned himself in because he "felt like [he] needed to" and that there's "no explanation that I could give anyone or anybody could give anyone to try and make it right or make [the killings] seem rational." Def. Tr. Ex. 84A at 1:50, 2:17-2:22. Wells also tearfully states that he wants to die. *Id.* at 4:19, 4:40-4:50. And he asks people to "pray for" the victims' family because "[t]hey deserve that." *Id.* at 6:33.

The State objected to the introduction of all four recordings as hearsay. ROA.13492, ROA.13502. Trial counsel explained that he was not "offer[ing]" the

videos for their truth, but instead to show "the Defendant's condition mentally" in the aftermath of the shootings. ROA.13493. Trial counsel contended that the tapes were "mitigating" and that "it's not, with all due respect, either the Court's determination or the State's determination to keep something that might be mitigating away from the jury." ROA.13493.

The trial court excluded the videos, "sustaining . . . the State's objection." ROA.13500, ROA.13502-13504. As to the custodial tape, the trial court stated that it was "exclud[ing] the recording of Mr. Wells while not being interviewed but being detained at the Fort Worth Police Department contained in the Defendant's Exhibit." ROA.13500. Given that the hearsay rationale applied to the *interview* portion as well, defense counsel understood the trial court to have excluded "the videos of [Wells] on television and his statement to the police" in full, as counsel's post-trial affidavits make clear. ROA.16783, ROA.16803-16804.

During closing arguments, the State urged the jury to sentence Wells to death based in part on his purported lack of remorse. Prosecutors asked jurors to take note of the fact that "the Defendant *never shed a tear* . . . in describing" the offense. ROA.13817 (emphasis added).

**c.** The jury returned a verdict finding (1) a probability that Wells would commit violent crimes in the future, and (2) the absence of mitigating circumstances

justifying a sentence short of death.  ROA.5860-5861.  The trial court sentenced Wells to death.  ROA.5860-5861.

**4.**    Wells appealed his conviction and death sentence.  *See* Appellant's Brief on Appeal, *Wells v. State*, No. AP-77,070, 2018 WL 2434548 (Tex. Crim. App. May 14, 2018).  As relevant here, Wells argued that his death sentence should be vacated because the trial court's decision to exclude the custodial video violated his constitutional right to present "highly relevant" mitigation evidence of remorse.  *Id.* at *76.  Appellate counsel did not initially raise the same argument with respect to the jailhouse interview videos, and later unsuccessfully sought leave to do so.  *See* ROA.6028-6033, ROA.6054-6092; Notice and Endorsed Order, *Wells v. State*, No. AP-77,070 (Tex. Crim. App. Jan. 7, 2019).  At oral argument, judges expressed concern that under Supreme Court precedent, the custodial video should have been admitted notwithstanding state hearsay rules.  *See* ROA.322-356.

In November 2020, the TCCA issued its opinion.  The court concluded that the trial court's decision to exclude the custodial tape did not violate Wells' constitutional right to a fair trial because it was not "critical" to his defense.  *Wells*, 611 S.W.3d at 423.  The TCCA also ruled that (1) trial counsel failed to preserve the claim, despite offering it in "mitigation," because he did not say "remorse"; (2) Wells' cited examples of remorse appeared in the *interrogation* portions of the

video, which the trial court did not exclude; and (3) any error was harmless. *Id.* at 422-23.

## II. STATE POST-CONVICTION PROCEEDINGS

On April 18, 2019, Wells filed a state habeas application. ROA.16824. That application included three ineffective assistance of counsel (IAC) claims: (1) that trial counsel were ineffective for presenting the violence-genetics theory; (2) that appellate counsel was ineffective for failing to challenge the exclusion of the jailhouse interview videos; and (3) that trial counsel were ineffective for allowing Hakizimana to be seated as a juror. ROA.16865 (violence-genetics theory); ROA.17101-17122 (seating of Hakizimana as juror); ROA.17178-17192 (exclusion of jailhouse interview videos). Included in the state habeas application was a declaration from Hakizimana, which stated that "I believe that if you kill someone, you should be killed too. I said that in the form I filled out for jury selection." ROA.17388.

The state habeas trial court adopted nearly all of the State's proposed findings of facts and conclusions of law and recommended that the TCCA deny relief on all of Wells' claims. ROA.17968. As to the violence-genetics IAC claim, the court concluded that trial counsel made a reasonable strategic decision to present that theory and that Wells was not prejudiced as a result. ROA.17796-17798. As to the juror IAC claim, the court concluded that trial counsel similarly made a reasonable

strategic judgment not to challenge the juror for cause or with a peremptory strike. ROA.17811-17815. As to the appellate-counsel IAC claim, the court held that a claim based on the excluded interview videos would not have succeeded on appeal and that Wells had not established deficient performance or prejudice. ROA.17832.

The TCCA denied relief. *Ex parte Wells*, No. WR-86,184-01, 2021 WL 5917724 (Tex. Crim. App. Dec. 15, 2021), *cert. denied sub nom.*, *Wells v. Texas*, 142 S. Ct. 2722 (2022). With respect to the trial-counsel IAC claims, the court stated, "Applicant fails to meet his burden under *Strickland v. Washington*, 466 U.S. 668 (1984), to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that there was a reasonable probability that the result of the proceedings would have been different but for counsel's deficient performance." *Id.* at *1. The court made the same basic statement with respect to the appellate-counsel IAC claim. *Id.* at *1-2. The court adopted the state habeas trial court's findings of fact and conclusions of law on these claims. *Id.* at *2.

### III. FEDERAL HABEAS PROCEEDINGS

1. On March 20, 2023, Wells filed an amended federal habeas petition. ROA.517. Of the claims raised in that petition, four are relevant here: (1) trial counsel was ineffective for presenting the violence-genetics theory, ROA.580-596; (2) the exclusion of the video evidence showing Wells' remorse violated his

16

constitutional right to present mitigating evidence, ROA.546-577; (3) with respect to the media interview videos, appellate counsel was constitutionally ineffective for failing to raise that issue on direct appeal, ROA.546-577, ROA.639-640; and (4) trial counsel was ineffective for allowing Hakizimana to be seated as a juror, ROA.626-631.

2.      The district court denied the petition and also denied a COA with respect to all issues.  ROA.1234.

The district court rejected Wells' IAC claim based on the violence-genetics theory on the ground that counsel made a reasonable strategic decision to present double-edged evidence that lessened Wells' moral blameworthiness even as it suggested he would be violent in the future.  ROA.1212.  The court stated that Wells had not demonstrated prejudice.  ROA.1214.

The district court rejected Wells' claim that the exclusion of the custodial and jailhouse videotapes violated Wells' Eighth Amendment right to present relevant mitigating evidence.  As to the media interviews, the court held that the Eighth Amendment did not require their admission because they lacked reliability or probative value.  ROA.1189.  As to the custodial video, the district court limited its consideration to the non-interrogation portion of the tape and concluded that any exclusion was harmless.  ROA.1190.  The court also concluded that in any event,

Wells' claim was barred by an independent and adequate state ground because the TCCA had held that Wells had forfeited his claim. ROA.1190.

The court also rejected Wells' appellate-counsel IAC claim predicated on failure to raise on appeal the exclusion of the jailhouse interview videos based on lack of prejudice. ROA.1227.

Finally, the court rejected Wells' IAC claim based on failure to challenge Hakizimana on the ground that counsel made a reasonable strategic decision. ROA.1218-1219. The court held that Hakizimana's statements about the death penalty did not render him subject to a valid for-cause challenge, and that trial counsel reasonably refrained from using a peremptory strike. ROA.1220. The court also held that Wells had not demonstrated prejudice. ROA.1220.

**3.** Wells filed a motion under Federal Rule of Civil Procedure 59(e) to alter or amend the district court's judgment. ROA.1240. The court denied the motion. ROA.1320.

## SUMMARY OF ARGUMENT

Wells is entitled to a COA on his IAC and Eighth Amendment claims.

**I.** A COA should issue on Wells' claim that trial counsel rendered ineffective assistance by presenting expert testimony during sentencing that Wells had defective genetics that incurably predisposed him to be violent. That testimony definitively established one of the prerequisites for Wells to be sentenced to death:

that he is likely to commit violent crimes in the future. At the same time, the testimony had virtually no mitigating value—and in fact only harmed the remainder of the mitigation case. Under those circumstances, counsel's decision cannot be characterized as a strategic choice warranting deference.

Counsel's presentation of the violence-genetics testimony was also deficient performance under *Buck v. Davis*, 580 U.S. 100 (2017). There, the Supreme Court held that counsel acts incompetently by inviting the jury to sentence the defendant to death based on an immutable characteristic with no connection to future dangerousness or moral culpability. That is precisely what happened here. At the time of Wells' sentencing, it was known that there was no reliable scientific connection between the gene in question and a propensity for violence. Trial counsel thus effectively encouraged the jury to sentence Wells to death based on an immutable characteristic that should have been irrelevant.

Trial counsel's presentation of the violence-genetics testimony prejudiced Wells. *Buck* makes plain that at least one juror could have reached a different conclusion on future dangerousness absent that testimony. The other evidence the prosecution relied on to meet its burden of proving future dangerousness was weak, and the violence-genetics testimony was especially likely to sway the jury because it came from a witness who was presented to the jury as a qualified expert, and what is more, was presented by *the defense*.

**II.** A COA should also issue on Wells' claim that the trial court's exclusion of the custodial video violated Wells' Eighth Amendment right to present reliable, relevant mitigating evidence notwithstanding state evidentiary rules. *Green v. Georgia*, 442 U.S. 95, 97 (1979). The video provided a visceral demonstration of Wells' remorse in the immediate aftermath of the offense and therefore would have been powerful mitigating evidence. That error was not harmless: evidence of remorse would have been the defense's best chance to humanize Wells in the jury's eyes. And, contrary to the district court's holding, Wells' Eighth Amendment claim is not barred by an adequate and independent state ground.

**III.** A COA should issue on Wells' claim that appellate counsel provided ineffective assistance in failing to challenge the trial court's exclusion of media interview videos in which Wells expressed his remorse. Like the custodial video, the media interview videos would have provided compelling mitigating evidence.

**IV.** A COA should issue on Wells' claim that trial counsel was ineffective in permitting Hakizimana to be seated on the jury. In his questionnaire and during *voir dire*, Hakizimana repeatedly opined that a death sentence should be automatic upon conviction. Despite his occasional equivocation, Hakizimana's fundamental views were clear, and counsel should have sought to strike him for cause or, at a minimum, used a peremptory challenge or agreed to the prosecution's request to

exclude him.  Counsel's failure to do so prejudiced Wells, as the seating of a biased juror necessarily causes prejudice.

## STANDARD OF REVIEW

A COA should issue "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A COA may be granted "even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."  *Id.* at 336.

Under 28 U.S.C. § 2254(d)(1), when a state court has rejected an applicant's claim on the merits, federal habeas relief is available only if the state court's resolution of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  An applicant is entitled to a COA if the district court's assessment of the claim under the § 2254(d)(1) framework is debatable.  *See Garza v. Stephens*, 738 F.3d 669, 674 (5th Cir. 2013).

**ARGUMENT**

**I.   A COA SHOULD ISSUE ON WHETHER TRIAL COUNSEL WERE INEFFECTIVE BY PRESENTING TESTIMONY THAT WELLS WAS GENETICALLY PREDISPOSED TOWARD VIOLENT CONDUCT.**

At sentencing, Wells' defense counsel made the prosecution's case for future dangerousness for it, by presenting expert evidence that Wells had a genetic anomaly that predisposed him to violence.  That evidence was in itself sufficient to enable the jury to answer "yes" to the future-dangerousness special issue that was a prerequisite to imposing a death sentence.  Counsel thus did not merely *concede* the prosecution's case of future dangerousness, though that in itself would have been unreasonable; counsel went further, and presented *affirmative* evidence establishing that Wells likely would be dangerous in the future.  That evidence doubtlessly had a powerful effect on the jury, as it came from a purportedly qualified expert psychiatrist who was testifying for the defense.  Though counsel ostensibly presented the evidence in mitigation, its tendency to establish Wells' reported propensity for violence far outweighed any mitigating effect.  Indeed, if anything, the genetic evidence undermined the remainder of Wells' mitigation case.  Making matters worse, the science underlying the theory had been debunked, meaning that defense counsel invited the jury to sentence Wells to death based on an immutable characteristic—his genetic makeup—that had no relation whatsoever to any relevant sentencing consideration.

In those circumstances, counsel's decision to present the evidence cannot possibly be characterized as a reasonable strategic judgment. Instead, it constituted deficient performance that prejudiced Wells. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). The TCCA's contrary decision represents an unreasonable application of Supreme Court precedent establishing that counsel may not concede aspects of the prosecution's case without any reasonable expectation of commensurate advantages to the defense—and may not invite the jury to sentence the defendant to death based on irrelevant immutable characteristics. The district court's adoption of the TCCA's rationale is at the very least debatable by reasonable jurists.

A. **Presenting the Violence-Genetics Theory Established Wells' Future Dangerousness, Thereby Relieving the Prosecution of Its Burden to Prove that Special Issue.**

Trial counsel presented expert testimony that Wells was genetically predisposed to violence because his defective MAOA gene made it more difficult for him to control his anger. ROA.13044. Defense expert Bernet explained that while 7% of people without the violence gene went on to be convicted of a violent crime, people like Wells—those with the violence gene and adverse childhood experiences—were "four and a half times" more likely than others to commit acts of violence. ROA.13057; *see also* ROA.13078 (similar testimony). In other words, *32%* of people like Wells go on to be convicted of a violent crime. ROA.13057.

Moreover, because genetics are an immutable characteristic, the clear import of Bernet's testimony was that anyone with the violence gene and childhood maltreatment was *incurably* predisposed to commit violent acts, regardless of treatment or environment.

That testimony provided a sufficient basis for the jury to conclude that Wells might be dangerous in the future—in other words, to answer "yes" to the future-dangerousness special issue. The jury was instructed that it should find the future-dangerousness issue satisfied if there was "more than a 'possibility'" of future violence, a standard that was met even if the chances were *less than* "more likely than not" or even 50/50. *Hughes v. State*, 878 S.W.2d 142, 147-48 (Tex. Crim. App. 1992); ROA.7575 (trial court forbidding defense counsel from suggesting that "probability" means more "than 50/50" or "more likely . . . than something else," and defense counsel acknowledging that "there's no number on it"); *see also, e.g.*, ROA.7159-7161, ROA.7290, ROA.7552, ROA.10907-10908. The defense-expert testimony that 32% of people with Wells' genetic makeup and background go on to be convicted of violent crimes easily satisfied that low threshold.

If there were any doubt on that score, it is eliminated by the prosecution's own insistence that the defense had conceded future dangerousness by presenting Bernet's testimony. The prosecution told the jury, "this is the easy answer, and *they conceded it through all their experts*," including Bernet. ROA.13793 (emphasis

added).  The prosecution repeatedly underscored that Bernet "agreed" that Wells "is dangerous," and that given the genetic context, Wells' dangerousness was immutable:  "He's never going to not be dangerous."  ROA.13751; *see also* ROA.13751 (Bernet "agreed" that Wells "will continue to be dangerous").  And yet again, the prosecution impressed upon the jury that Bernet's testimony was "telling us [Well's] going to be dangerous . . . .  Yes.  That's what that was all about." ROA.13791.

**B.  Trial Counsel Performed Deficiently By Presenting Evidence that Established Wells' Future Dangerousness.**

**1.**  Supreme Court precedent clearly establishes that counsel performs deficiently by presenting harmful, aggravating evidence that establishes a prerequisite for the death penalty while providing little to no benefit in mitigation. Counsel's duty is to "make the adversarial testing process work in the particular case" by advocating for an outcome favorable to the defendant.  *Strickland*, 466 U.S. at 690.  In service of that end, counsel unquestionably has wide leeway to make "strategic choices" concerning evidence presentation.  *Id*. at 690-91.  But inherent in the concept of a strategic decision is a reasonable judgment that the chosen course, despite its potential downsides, will ultimately advance the defendant's objectives. *See id*. at 688, 690-91.  That is particularly clear in the case of strategic choices that have the effect of conceding—or, as here, affirmatively establishing—an aspect of

the prosecution's case. Given that conceding an element of the prosecution's case departs from the adversarial process, a decision to do so is reasonable only to the extent that counsel reasonably believes that the defendant will receive commensurate advantages with respect to *other* aspects of the adversarial process. Thus, for instance, under *Florida v. Nixon*, 543 U.S. 175 (2004), counsel may concede guilt in the hope that doing so will help the defendant avoid a death sentence. *Id.* at 191-92; *see also United States v. Kadlec*, 22 M.J. 571, 573 (A.C.M.R. 1986) (concession reasonable if "the concession constitute[s] a sensible 'trade-off'"); *Haynes v. Cain*, 272 F.3d 757, 762 n.14 (5th Cir. 2001) (concession not ineffective assistance when there is an overall "advantage to be gained" (citation omitted)). But where counsel presents evidence that establishes part of the prosecution's case without *any* corresponding advantage to the defendant in the adversarial process, counsel has not made a reasonable strategic judgment, but instead has failed to perform his duty of "mak[ing] the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690.

2. That is what happened here. The violence-genetics evidence established the prosecution's future-dangerousness case without *any* corresponding advantage to Wells in mitigation—indeed, the violence-genetics testimony *undermined* the remainder of the mitigation case. In those circumstances, counsel's use of the testimony cannot be defended as a reasonable strategic judgment. Instead,

counsel failed in their fundamental duty to subject the prosecution's case to adversarial testing. *See id.* at 690.

Any competent attorney would have understood that Bernet's testimony had the potential to inflict grave damage on Wells' prospects for avoiding the death penalty. That is obvious from the substance of the testimony itself: the future-dangerousness prerequisite to death asks the jury to decide whether the defendant might commit violence in the future, and Bernet testified that Wells was predisposed to do just that. ROA.13077 (Q: you've . . . been . . . telling this jury . . . this defendant's going to be violent in the future." A: "I think he does have risk factors . . . that may make it harder for him to control his anger than it is for other people in the future.").

Any competent attorney also would have understood that the prosecution's case for future dangerousness was quite weak: it rested solely on the offense of conviction; Wells' violence in another romantic relationship, ROA.13747-13750; and a single incident with another inmate while Wells was in jail, ROA.13750. But as the Supreme Court has recognized, jurors could view a defendant's violence in romantic relationships—which described both the offense of conviction and Wells' prior conduct outside of prison—as *not* indicative of future violence when "no . . . romantic relationship would be likely to arise" during incarceration. *Buck v. Davis*, 580 U.S. 100, 120-21 (2017). And as the Court has also recognized, testimony from

an expert for the defense that the defendant may be dangerous in the future is likely to carry heavy weight with the jury. *Id*. Counsel was thus presented with a situation in which the jury could well have concluded that Wells was not likely to be dangerous in the future—yet counsel pressed forward in arguing to the jury that Wells was genetically predisposed to violence.

At the same time, competent counsel would have recognized that Bernet's testimony provided virtually no benefit to the defense's mitigation case—which, of course, was Wells' only hope of avoiding the death penalty if the jury believed that Wells would be dangerous in the future. The ostensible purpose of the violence-genetics testimony was to establish that Wells was unable to control his anger and was therefore less blameworthy. But evidence that a defendant cannot properly manage his impulses is widely considered some of the least-effective mitigation available. It "tends to offer little, if any, *quality* mitigating evidence." *Littlejohn v. Royal*, 875 F.3d 548, 562 (10th Cir. 2017) (emphasis in original). Issues with impulse control are not particularly "atypical or unusual," and evidence of this kind "tend[s] to depict" the defendant "as an unstable individual," rather than sympathetic. *Id*. (citations omitted).

Making matters worse, here counsel attributed Wells' impulse-control issues to a *genetic* predisposition for violence, rather than afflictions that evoke sympathy, such as mental illness or disability. If anything, such testimony could risk conjuring

"powerful racial stereotype[s] . . . of black men as 'violence prone.'" *Buck*, 580 U.S. at 121 (quoting *Turner v. Murray*, 476 U.S. 28, 35 (1986)). Indeed, Wells' own counsel described him as a "defect" and a "gangster" who was incurably predisposed to violence. ROA.13768, ROA.13773.

The violence-genetics testimony also undermined Wells' only other significant mitigation argument, which was that he had had a traumatic childhood. The defense presented evidence that, among other things, Wells frequently witnessed domestic violence and had been abandoned by his father. ROA.13342-13343; *see* ROA.13329 (expert testimony about Wells' "complex developmental trauma"). But in the very next breath, the defense *minimized* Wells' childhood mistreatment: because the violence-genetics theory relied on Wells' having suffered moderate—*but not severe*—childhood maltreatment, Bernet characterized Wells' childhood mistreatment as within the moderate range. ROA.13045. Bernet also asserted that, under the definition of childhood maltreatment in a prominent study of the violence gene, Wells had not even experienced maltreatment at all. ROA.13084, ROA.13103. And once again, the prosecution took full advantage, highlighting in closing arguments Bernet's acknowledgment that Wells had not experienced "severe childhood maltreatment." ROA.13754. Counsel's presentation of Bernet's testimony therefore undermined the defense's best—and only—chance of humanizing Wells before the jury. *Cf. Rompilla v. Beard*, 545 U.S. 374, 392-93

(2005) (recognizing that hearing about defendant's severely abusive childhood could have led jury not to impose death penalty). No rational defense counsel would opt for such a senseless course of action.

The TCCA's conclusion that counsel did not perform deficiently therefore constituted an unreasonable application of *Strickland* and *Nixon*—and the district court's parallel conclusion is at minimum reasonably debatable. This was no ordinary strategic trade-off: counsel presented affirmative evidence *establishing* a prerequisite for the death penalty, thereby relieving the prosecution of its burden. Counsel thus dramatically raised the stakes of the mitigation case—even as the violence-genetics theory weakened that case. In no sense can counsel's actions be viewed as a reasonable strategic judgment. The very concept of a "strategic judgment," as explicated in cases like *Strickland* and *Nixon*, assumes that counsel reasonably anticipates that the defendant will receive a net advantage from the chosen course. *See* pp. 25-26, *supra*. But here counsel's decisions caused only harm to Wells—and that inevitable outcome would have been obvious to any competent counsel.

For the same reasons, the district court's characterization of the violence-genetics evidence as "double-edged" evidence that counsel might reasonably present in mitigation is simply wrong. ROA.1212. This evidence had only one real edge: aggravation. No doubt for that reason, none of the cases on which the district court

30

relied addresses facts anything like those here, where defense counsel presented clearly aggravating evidence that had no mitigating value.  *See* ROA.1212-1213 (citing cases).

## C. Trial Counsel Also Performed Deficiently By Inviting the Jury to Sentence Wells to Death Based on an Irrelevant Immutable Characteristic.

Counsel's introduction of the violence-genetics theory constituted deficient performance for an additional reason: it enabled the jury to sentence Wells to death based on an immutable genetic trait that bore no relation to any permissible sentencing consideration.

**1.** Competent counsel would have realized that there is in fact no scientifically reliable connection between Wells' MAOA gene and any predisposition to violence.  By the time of Wells' 2016 sentencing, the violence-genetics theory had been thoroughly debunked.  ROA.15134; *see* ROA.12836 (studies are "fraught with problems with methodology, interpret[ive] flaws, including inconsistencies and . . . loose standards for replication").  Bernet's testimony relied on "scientific studies that had been strongly and publicly criticized as potentially wrong or misleading."  ROA.15144; *see* ROA.15138.  The theory's unreliability should have been evident to counsel: courts had concluded this evidence was unreliable, *Mobley v. State*, 265 Ga. 292, 293 (1995), and there was widespread and well-publicized "skeptic[ism] regarding the credibility of gene plus

31

environment findings," ROA.12836; *cf. Murphy v. Davis*, 901 F.3d 578, 592-93 (5th Cir. 2018) (if there is a "red flag," counsel not entitled to blindly rely on expert's opinions (citation omitted)). But because the *defense* presented the evidence, and the prosecution had no incentive to attack its reliability, *see* ROA.13077-13097, the jury never learned that the evidence had no scientific validity. Instead, they were presented with "expert" testimony that Wells was statistically, concretely likely to commit violence in the future because of his genetic makeup. *See* ROA.13019-13020, ROA.13060-13069.

Because the violence-genetics theory was (and is) scientifically invalid, there was no basis to believe that Wells' MAOA gene caused him to lack impulse control or made him more likely to be violent in the future. Effectively, the evidence invited the jury to sentence Wells to death based on his genetic makeup alone—an immutable characteristic that had no connection to future dangerousness. The Supreme Court has long held that a State may not sentence the defendant to death based on aggravating factors that are "irrelevant to the sentencing process." *Zant v. Stephens*, 462 U.S. 862, 885 (1983); *see Johnson v. Mississippi*, 486 U.S. 578, 586 (1988) (constitutional error to permit jury to consider in aggravation the fact of earlier conviction that was later vacated). A prime example of such "irrelevant" factors are immutable characteristics that bear no relation to the sentencing inquiry into moral culpability and future dangerousness. *Buck*, 580 U.S. at 119; *Zant*, 462

32

U.S. at 878-79.  As *Buck* explained, "[d]ispensing punishment on the basis of an immutable characteristic flatly contravenes th[e] guiding principle" that "[o]ur law punishes people for what they do, not who they are."  580 U.S. at 123.  In *Buck*, the irrelevant immutable characteristic at issue was race; but *Buck* itself and earlier decisions such as *Zant* make clear that it is error to sentence the defendant to death based on *any* irrelevant immutable characteristic.  *Buck*, 580 U.S. at 124 (noting that departure from "basic principle" of individualized sentencing was "*exacerbated* because it concerned race" (emphasis added)); *Zant*, 462 U.S. at 885 (factors that may not be used in aggravation because they are irrelevant include mental illness); *Romano v. Oklahoma*, 512 U.S. 1, 7 (1994) (citation omitted) (decision to impose the death sentence must "rest on [an] individualized inquiry").

It therefore would have been "patently unconstitutional" for the *prosecution* to argue that Wells should be sentenced to death based on his genetic makeup alone, when there was no link between the MAOA gene and propensity for violence.  *Buck*, 580 U.S. at 119 (citing *Zant*, 462 U.S. at 885); *cf. United States v. Cossey*, 632 F.3d 82, 88 (2d Cir. 2011) ("undisput[ably] . . . impermissible" for a sentencing court to make a finding about the defendant's likelihood to re-offend based on an "unsupported theory of genetics").  And therefore, as *Buck* held, it is necessarily deficient performance for a *defense* attorney to "introduce such evidence about his own client."  *Buck*, 580 U.S. at 119.  It cannot be reasonable performance to present

aggravating evidence that the prosecution could not—because it violates the bedrock principle that punishment must be based on Wells' character and actions rather than identity. *See Romano*, 512 U.S. at 7.

**2.** The TCCA's rejection of Wells' IAC claim thus represents an unreasonable application of *Buck* as well as *Strickland* and *Nixon*. *Buck* squarely held that counsel performs deficiently by presenting evidence that invites the jury to sentence the defendant to death based on an immutable characteristic that has no relation to the defendant's future dangerousness or moral culpability. *See* pp. 32-33, *supra*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) ("unreasonable application" includes application of the decision's rule to facts different from those presented in the decision itself).

The district court's reasons for rejecting Wells' claim are at minimum debatable. The court asserted that the violence-genetics theory was not unreliable, *see* ROA.1328 (citing ROA.1196-1197), but the record evidence makes plain that the relevant "studies . . . had been strongly and publicly criticized as potentially wrong or misleading," ROA.15144; *see also* ROA.12835-12836 (prosecution's examination of Bernet on this point). To the extent the district court also believed that Wells' claim was barred by the "*Teague* non-retroactivity doctrine because no precedent constitutionally proscribes the presentation of genetic information," ROA.1199, that misses the point. Supreme Court decisions such as *Zant* have long

34

prohibited a death sentence based on irrelevant immutable characteristics (of which the genetic information here is an example), as *Buck* itself makes plain.

**D. The Presentation of the Violence-Genetics Theory Prejudiced Wells.**

The record leaves no doubt that absent defense counsel's unreasonable decision to present Bernet's testimony, Wells may well not have been sentenced to death. The TCCA's contrary conclusion was an unreasonable application of *Strickland* and *Buck*.

1. There can be no question that counsel's presentation of future-dangerousness evidence that undermined the mitigation case prejudiced Wells. *Buck* establishes that defense counsel's presentation of expert evidence that has aggravating import gives rise to *Strickland* prejudice. In *Buck*, as here, Texas's "future dangerousness" special issue was a major focus of the sentencing proceeding. There, as here, the prosecution's primary evidence of future dangerousness was the defendant's past violence in romantic relationships. That evidence was not particularly persuasive, the Court recognized, because incarceration in prison, where "no such romantic relationship would be likely to arise," would "minimize the prospect of future dangerousness." *Buck*, 580 U.S. at 120-21. But expert testimony that Buck's race predisposed him to violence purported to be "hard statistical evidence—from an expert—to guide an otherwise

speculative inquiry." *Id.* at 121. That evidence was presented by a witness qualified as an expert by the court, leading "[r]easonable jurors" to "value[]" his opinion. *Id.* Further heightening the testimony's power, "[w]hen a defendant's own lawyer puts in the offending evidence, it is in the nature of an admission against interest, more likely to be taken at face value." *Id.* at 122. For those reasons, the Court found prejudice—despite the brutality of the crime and other evidence of future dangerousness.

All of those same considerations are present here. Absent Bernet's testimony, the jury may well have declined to find future dangerousness; the prosecution's case was hardly overwhelming. *See* pp. 27-28, *supra*. As in *Buck*, most of Wells' past violence (including the offense itself) had occurred in romantic relationships that would not be present in prison. *See* p. 27, *supra*. Although the prosecution cited one incident from prison, ROA.13750, the defense had presented testimony that Wells was otherwise a well-behaved inmate, *see* ROA.12287-12288. Bernet, like the expert in *Buck*, was presented to the jury as a learned psychiatry professor— someone who "took the stand as a medical expert bearing the court's imprimatur," 580 U.S. at 121, and who provided the jury with seemingly concrete studies replete with percentages expressing relative predisposition to violence. And that "hard statistical evidence" was provided by the *defense* itself, heightening its credibility. *Id.* Had Bernet not asserted that Wells would be a future danger, there is a reasonable

probability that "at least one juror would have harbored a reasonable doubt" as to whether Wells was "likely to be violent in the future" based on the available evidence. *Id*. at 120.

In addition, although prejudice concerning the future-dangerousness issue is sufficient to establish that the outcome might have been different, here Bernet's testimony also undermined the mitigation case. Evidence of childhood mistreatment is generally "powerful" mitigating evidence. *Wiggins*, 539 U.S. at 534. And here, Wells' childhood was the only aspect of the mitigation case likely to evoke sympathy; the other mitigation argument—that Wells was unable to manage his anger—depicted him as out of control. Wells' childhood experiences therefore gave the jury "an alternative" and "palatable[] way" to exercise mercy. *Wilson v. Sirmons*, 536 F.3d 1064, 1093 (10th Cir. 2008). Yet Bernet told the jury that Wells' childhood was simply not that bad—and that by one study's metric, Wells had a childhood free of meaningful mistreatment. *See* p. 29, *supra*. Absent that testimony, at least one juror could well have given more weight to the mitigation case.

**2.** The district court's contrary conclusion is erroneous, and at least reasonably debatable. The court did not acknowledge *Buck*'s discussion of prejudice, much less suggest any reason that its rationale does not apply with full force here. Instead, the court focused on the gravity of the offense and Wells' history of domestic violence as independent evidence of Wells' future dangerousness—but

both of those considerations were present in *Buck* as well. ROA.1213, ROA.1328. There, the Court found prejudice despite the similarly severe offense (which, like Wells', involved a multiple murder arising out of domestic violence). Just as in *Buck*, here the jury could have concluded that the nature of Wells' offense did not establish that Wells would be dangerous in prison, where he would not have romantic relationships.

The district court also concluded that trial counsel had "presented a substantial case in mitigation." ROA.1213, ROA.1328. But the court never mentioned, much less evaluated, how Bernet's testimony had directly undercut the mitigation case.

## II.   A COA SHOULD ISSUE WITH RESPECT TO WHETHER THE EIGHTH AMENDMENT REQUIRED ADMISSION OF THE POWER-FUL REMORSE EVIDENCE CONTAINED IN THE CUSTODIAL VIDEOTAPE.

The Court should also issue a COA with respect to the trial court's decision to exclude the Fort Worth Police Department video that captures Wells' interrogation and expressions of remorse while in custody. ROA.13500. Notwithstanding the video's obvious relevance to Wells' mitigation case, the trial court excluded the video upon the State's hearsay objection. ROA.13500.

On direct appeal, the TCCA affirmed, asserting that the exclusion did not deprive Wells of a fair trial; any exclusion was harmless; and the argument was forfeited because trial counsel had sought only to introduce the video as mitigation

evidence rather than specifically evidence of remorse. On the merits, the TCCA's decision represents an unreasonable application of the Supreme Court's bedrock Eighth Amendment precedents, as well as its harmless-error precedents. And the court's forfeiture ruling cannot stand as an adequate and independent state ground barring federal habeas review. The district court's approval of the TCCA's decision is erroneous for the same reasons, and at minimum reasonably debatable.

A. **The Trial Court's Exclusion of the Tape Violated Wells' Eighth Amendment Rights.**

1. It is clearly established that the Eighth Amendment entitles a capital defendant to present, and to have the jury consider, mitigating factors addressing "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *Nelson v. Quarterman*, 472 F.3d 287, 303 (5th Cir. 2006). One particularly powerful category of mitigating evidence is evidence of remorse, which can be especially persuasive in convincing jurors not to vote for death. *See Canales v. Davis*, 966 F.3d 409, 416 (5th Cir. 2020); *see also Williams v. Taylor*, 529 U.S. 362, 398 (2000) (evidence of defendant's abusive childhood, combined with evidence that he "turned

himself in" and "express[ed] remorse for his actions" "might well have influenced the jury's appraisal of his moral culpability").

At Wells' trial, counsel sought to introduce an eight-hour video showing Wells' remorseful actions and statements in the immediate aftermath of the offense. The video consists of six hours of footage where Wells is alone in the room, and approximately two hours of footage from multiple interrogations. In Wells' state and federal habeas proceedings, the TCCA and the district court considered only the six-hour, non-interrogation portion of the video on the ground that the trial court excluded only that portion. But trial counsel sought to admit the video in its entirety, ROA.13491, and the prosecution objected on hearsay grounds. The trial court stated, without further explanation, that it was excluding "the recording of Mr. Wells while not being interviewed." ROA.13500. That ruling—to the extent it was based on hearsay—would have applied with equal, if not greater, force to the interrogation portions of the video that counsel had also asked to introduce. Thus, the trial court's ruling is best understood to have excluded the entire video.

In any event, even considering only the clearly excluded non-interrogation portion, the video provided powerful mitigating evidence. Wells appears extremely upset and in shock, and repeatedly tells himself that he "must be dreaming," Def. Tr. Ex. 81 at 20:25:00-20:27:17, 20:29:30-20:30:20. After detectives tell him the victims have died, he begins to hit himself in the face, *id.* at 21:27:02-21:27:25, asks

40

for Reed and starts sobbing into a chair, pleading for someone to wake him up, *id.* at 21:28:30-21:29:17. The TCCA did not dispute that the video shows Wells' remorse, and it acknowledged that this evidence of Wells' mental state was directly relevant to the mitigation case. *Wells*, 611 S.W.3d at 423.

The full eight-hour tape including the interrogation portion is even more powerful. In the first interrogation, mere hours after the offense, Wells confesses that he "wants to die" and begins to sob. Def. Tr. Ex. 81 at 20:38:19-20:39:56. Wiping his tears away with his hands and his shirt sleeves, he explains that he "needed" and wanted the police to shoot him when he turned himself in. *Id.* at 20:40:00-20:40:50. In the middle of the second interrogation, Wells begins to cry after hearing that all three victims are dead, *id.* at 4:32:27-4:33:17, and tells the detective that "I deserve [the death penalty]," *id.* at 5:04:40-5:05:08.

**2.** The trial court evidently excluded the video on evidentiary grounds, presumably hearsay, and, as the TCCA surmised, relevance and cumulativeness. *Wells*, 611 S.W.3d at 408. As the TCCA recognized, the evidence was in fact relevant. *Id.* at 423; *see Williams*, 529 U.S. at 398. But even assuming the state-law correctness of the remaining evidentiary objections, the Eighth Amendment entitled Wells to introduce the evidence anyway. The TCCA's failure to recognize that point constituted an unreasonable application of *Green v. Georgia*, 442 U.S. 95, 97 (1979).

In *Green*, the Supreme Court held that the Eighth Amendment right to present relevant mitigating evidence overcomes even otherwise-applicable substantive evidentiary rules such as hearsay rules, so long as the evidence has hallmarks of reliability. *Green*, 442 U.S. at 97; *see Sears v. Upton*, 561 U.S. 945, 950 & n.6 (2010). Here, neither the TCCA nor the district court expressed any concern about the reliability of the video, with good reason. The video—particularly the non-interrogation portion—was recorded by the Fort Worth Police Department mere hours after the crime, and shows Wells' statements and demeanor even when no one was in the room with him.

Nonetheless, the TCCA purported to distinguish *Green* on the ground that the video of Wells (unlike the exculpatory evidence in *Green*) was not "critical" to Wells' defense. 611 S.W.3d at 422. But the video was visual, unfiltered evidence of Wells' behavior, and it therefore had a visceral effect that could not be replicated. No witness could testify to how Wells had acted while alone in the interrogation room. *See Green*, 442 U.S. at 97; *see also United States v. Washington*, 417 F.3d 780, 787 (7th Cir. 2005) ("Tape recordings, whether video or audio, are powerful evidence . . . ."). The TCCA's conclusion that the exclusion "did not deprive [Wells] of a fundamentally fair trial," *Wells*, 611 S.W.3d at 423, was therefore an unreasonable application of *Green*.

The district court did not address the merits of Wells' claim with respect to the custodial video, but for the same reasons, reasonable jurists could conclude that the trial court's decision to exclude this footage violated Wells' constitutional right to have the jury consider evidence of his remorse as a mitigating factor in favor of a life sentence. That is so whether or not the inquiry is limited to the six-hour non-interrogation portion of the video.

## B.     The Video's Exclusion Was Not Harmless.

The district court, like the TCCA, held that the video's exclusion was harmless. *Wells*, 611 S.W.3d at 410; ROA.1189-1190. The TCCA's conclusion was an unreasonable application of the harmless-error rule of *Chapman v. California*, 386 U.S. 18, 23-24 (1967). For the same reasons, the erroneous exclusion had a "substantial and injurious effect or influence" in determining the jury's verdict. *Brown v. Davenport*, 142 S. Ct. 1510, 1523 (2022) (applying both the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), and 28 U.S.C. § 2254(d) to assess harmlessness).

Remorse is "commonly thought to lessen or excuse a defendant's culpability." *Brown v. Payton*, 544 U.S. 133, 142-43 (2005). As a result, "[i]n a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins v. Nevada*, 504 U.S. 127, 144 (1992) (Kennedy, J., concurring). That observation applies with

43

even greater force here. As discussed above, the primary mitigation evidence—that Wells had a genetic predisposition for violence—cast Wells in an extremely unsympathetic light, and required minimizing the severity of Wells' childhood mistreatment. Evidence that Wells had behaved in an extremely remorseful manner, immediately after the offense and when no one else was present with him, would have been the defense's best means of humanizing Wells in the jury's eyes (or in the eyes of one juror). And the fact that the evidence took the form of a video in which jurors could observe Wells' unfiltered behavior for themselves would have made it even more powerful.

Exacerbating the injurious effect of the exclusion, the State in its closing arguments highlighted Wells' seeming lack of remorse in urging the jury to vote for death. ROA.13817 ("the Defendant never shed a tear"). Given that the jury was expressly directed to consider Wells' lack of remorse, there can be little question that excluding video evidence of Wells' remorse had a substantial adverse effect on the verdict. *See Rhoades v. Davis*, 914 F.3d 357, 368 (5th Cir. 2019).

The TCCA held that the exclusion was harmless because Wells was able to present other evidence of his "mental state immediately after the offense." *Wells*, 611 S.W.3d at 411. But that other evidence—of Wells' behavior upon turning himself in, and an acquaintance's testimony about an overheard conversation in which Wells "sounded" remorseful, *id*.—was far less powerful than the video would

have been. Moreover, although the TCCA minimized the prosecution's closing-argument emphasis on Wells' failure to "shed a tear" as a reference to Wells' "in-court testimony" rather than a generalized lack of remorse, *id.* at 422, that misses the point. Even if the State was referring specifically to Wells' in-court testimony, the purpose of the remark was to suggest that Wells lacked remorse and therefore deserved a death sentence. Video footage showing Wells' clear anguish over the offense would have posed a significant obstacle to the State's argument. In short, once the State placed Wells' purported lack of remorse at issue, Wells was entitled to rebut the State's argument. His inability to do so cannot have been harmless. *See Simmons v. South Carolina*, 512 U.S. 154, 165-66 (1994).

### C. The State Court's Finding of Procedural Default Does Not Provide an Adequate and Independent State Ground.

The TCCA held that Wells forfeited his argument that the video should be admitted as relevant evidence of remorse, even though Wells expressly sought to introduce the video because it was "mitigating." The forfeiture ruling thus turned on counsel's failure to say the word "remorse." ROA.1190. But Texas courts do not apply the forfeiture rule so strictly. The district court therefore erred in holding that the TCCA's forfeiture ruling constituted an *adequate* and independent state ground barring federal habeas relief.

Federal courts deciding habeas corpus actions may find a claim procedurally defaulted based on a state-law ruling only if "the decision of [the state] court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Cruz v. Arizona*, 598 U.S. 17, 25 (2023) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). A state procedural rule "is an adequate basis for the court's decision only if it is strictly or regularly applied evenhandedly to the vast majority of similar claims." *Rocha v. Thaler*, 626 F.3d 815, 821 (5th Cir. 2010) (citation omitted). A corollary is that "a 'generally sound rule' may be applied in a way that 'renders the state ground inadequate to stop consideration of a federal question.'" *Cruz*, 598 U.S. at 26 (quoting *Lee*, 534 U.S. at 376).[1]

The TCCA's forfeiture ruling rested on Texas Rule of Appellate Procedure 33.1, which states that counsel must preserve a claim of error before the trial court by objecting with "sufficient specificity." Tex. R. App. P. 33.1(a). Texas courts have not regularly applied Rule 33.1 to find forfeiture under circumstances similar to those presented here—that is, where counsel argues the evidence is relevant for a

---

[1] The district court therefore erred by suggesting that this issue is settled by Fifth Circuit precedent holding that Texas's contemporaneous objection rule *generally* constitutes an adequate state procedural bar. *See* ROA.1191 (citing *Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007)). Because the rule's *application* is at issue here, *Scheanette* is irrelevant.

general purpose ("mitigation") without listing the specific ways in which the evidence might be mitigating.

It is well established that Texas courts "should avoid splitting hairs when determining whether a claim has been procedurally defaulted." *Keeter v. State*, 175 S.W.3d 756, 760 (Tex. Crim. App. 2005). "[A]ll a party has to do" to avoid forfeiture "is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him." *Clarke v. State*, 270 S.W.3d 573, 580 (Tex. Crim. App. 2008). "[A] party need not spout 'magic words' or recite a specific statute to make a valid objection." *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009).

Applying those principles, Texas courts have repeatedly found litigants have preserved *specific* contentions by citing a *general* reason. For instance, courts have concluded that "the one-word objection, 'hearsay,' was sufficient to put the trial judge and opposing counsel on notice of the reason for the objection"—even though there are numerous potential grounds for a hearsay objection. *Layton v. State*, 280 S.W.3d 235, 239 (Tex. Crim. App. 2009) (citation omitted). The en banc TCCA has explained that "[i]dentifying challenged evidence as hearsay or as calling for hearsay" is "a sufficiently specific objection, except under the most unusual circumstances." *Lankston v. State*, 827 S.W.2d 907, 910 (Tex. Crim. App. 1992) (en banc); *see also Ford*, 305 S.W.3d at 534.

47

More broadly, courts have concluded that a "general objection is sufficient where the specific ground is apparent from the context." *Hardie v. State*, 807 S.W.2d 319, 320 n.5 (Tex. Crim. App. 1991) (citation omitted). So an objection that evidence is "not 'relevant,' . . . although not as precise as it could be, ought ordinarily to be sufficient under the circumstances to apprise the trial court of the nature of the complaint." *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (en banc). And courts have also made clear that a litigant need not identify a particular rule or case to "fulfill[] the requirements of Rule of Appellate Procedure 33.1." *Rivas v. State*, 275 S.W.3d 880, 887 (Tex. Crim. App. 2009).

Under Texas precedent, Wells preserved his remorse claim. Counsel repeatedly offered the video "for all purposes" "in front of the jury" as "mitigating" evidence of Wells' "mental condition." ROA.13491, ROA.13493-13494, ROA.13496. Trial counsel's statements identified in plain English for the court "what he want[ed]" and "why he th[ought] himself entitled to it" in a manner "clear[] enough for the judge to understand him." *Clarke*, 270 S.W.3d at 580 (citation omitted). That should have been enough.

The TCCA's contrary conclusion is unexplainable under Texas law. It flouts precedent to conclude that offering evidence "for all purposes" because it is "mitigating" is not specific enough to preserve the argument that it is admissible to show remorse—a paradigmatic type of mitigation evidence. What is more, it was

48

"apparent from the context" that at least one reason trial counsel believed the videos were mitigating was that they showed remorse. *See Hardie*, 807 S.W.2d at 320 n.5. The state appellate court did exactly what Texas precedent forbids: it demanded a "magic word[]," remorse. *Ford*, 305 S.W.3d at 533.

Although Rule 33.1 is not novel, its "application to the facts here was." *Lee*, 534 U.S. at 382 (citation omitted). A state-law ruling is not adequate when a party cannot "fairly be deemed to have been apprised" of how the state rule would apply in his case—as is surely the case here. *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 457 (1958). The TCCA's "unforeseeable and unsupported state-court decision on a question of state procedure does not constitute an adequate ground to preclude" review of Wells' federal claim. *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964). At the very least, the district court's contrary conclusion is reasonably debatable.

## III. A COA SHOULD ISSUE WITH RESPECT TO WHETHER APPELLATE COUNSEL WAS INEFFECTIVE IN FAILING TO CHALLENGE THE EXCLUSION OF THE JAILHOUSE INTERVIEW VIDEOS.

The Court should also issue a COA as to whether Wells' counsel on direct appeal was ineffective in failing to appeal the exclusion of three media videos capturing Wells' remorse.

In addition to the custodial video discussed previously, trial counsel sought to introduce three videos containing portions of Wells' jailhouse media interviews the day after the murders. ROA.13501-13504. In those videos, Wells cries, expresses his desire to die, and apologizes. Def. Tr. Ex. 84A at 0:00-0:15; Def. Tr. Ex. 82A at 1:22-1:24. The trial court excluded all three videos as hearsay. ROA.13502. Notwithstanding the fact that their exclusion implicated the same constitutional issues as the exclusion of the custodial video discussed *supra*, appellate counsel did not raise their exclusion until after appellate briefing was complete. Counsel belatedly realized the apparent oversight and unsuccessfully sought to file a supplemental brief raising the issue. *See* Notice and Endorsed Order, *Wells v. State*, No. AP-77,070 (Tex. Crim. App. Jan. 7, 2019).

Reasonable jurists could conclude that appellate counsel was ineffective and that the TCCA's determination to the contrary unreasonably applied *Strickland*.

1.      As to deficient performance, the TCCA concluded that counsel did not "unreasonably fail[] to discover and raise nonfrivolous issues." *Ex parte Wells*, 2021 WL 5917724, at *1. The exclusion of the media videos, however, was not a frivolous issue for the reasons discussed above: under *Green*, 442 U.S. at 96, Wells had a right to present mitigating evidence of remorse notwithstanding state hearsay rules. *See* pp. 41-42, *supra*.

The district court attempted to distinguish *Green* on two grounds. The court first asserted that *Green* "does not reach" the videos because, unlike the evidence in *Green*, they were not exculpatory. ROA.1189. But this Court has never limited *Green* to exculpatory statements, and there is no principled basis for limiting *Green*'s Eighth Amendment rationale to particular categories of mitigating evidence. Remorse evidence is powerful mitigation for the reasons discussed above. Second, the district court viewed the videos as lacking "substantial indicia of reliability" under *Green* because they could have been self-serving. ROA.1189 (quoting *Simmons v. Epps*, 654 F.3d 526, 544 (5th Cir. 2011)). But unlike in *Simmons*, Wells did not attempt to justify himself or create the videos on his own. Instead, in the videos he tells reporters, while crying, that he is "truly sorry," that he "just wanted to die," that he "needed to" turn himself in to the police, and that there is "no explanation" he could give "to try to make it right or make it seem rational." Def. Tr. Ex. 84A at 0:00-0:15, 0:40-0:48. Far from being self-serving, the tapes show Wells accepting responsibility for the offense and candidly acknowledging that it was *unjustified*—long before he ever had a trial. *See* ROA.1189, ROA.1227. And jurors were capable of watching the videos and evaluating Wells' potential motives for themselves.

Nor can the failure to raise the issue be justified as a strategic decision. Although appellate counsel asserted in an affidavit that he made a considered

decision to forgo the issue, ROA.16743, the record belies that assertion, as counsel tried unsuccessfully to raise the issue after briefing was complete. That suggests negligence rather than deliberation.

    **2.**    Reasonable jurists could also disagree with the TCCA's determination that Wells failed to "demonstrate[] a reasonable probability that, but for appellate counsel's allegedly deficient performance, the outcome of his appeal would have been different." *Ex parte Wells*, 2021 WL 5917724, at *1. During oral argument on direct appeal, at least one judge was "troubl[ed]" by the exclusion of the *custodial* tape given its mitigating force. ROA.353; *see* ROA.341-342. Had the appeal encompassed the three videos capturing Wells' repeated, explicit expressions of remorse, the combined force of the videos may have resulted in a different outcome.

    The district court's contrary conclusion rested on its own belief that jurors could not have "stomach[ed]" "Petitioner's exercise in self-absorption any more than did this Court." ROA.1227. But the court's own emotional reaction to the videos is beside the point. The question is whether the appeal might have turned out differently, and on that point reasonable jurists could differ.

**IV.**    **A COA SHOULD ISSUE ON WHETHER TRIAL COUNSEL WERE DEFICIENT BY PREVENTING THE EXCUSAL OF A JUROR WHO**

**BELIEVED THAT THE DEATH PENALTY SHOULD BE MANDA-TORY FOR MURDER.**

Trial counsel provided ineffective assistance in failing to challenge—and, in fact, contesting the prosecution's challenge to—a juror who believed that anyone convicted of murder "must" be sentenced to death. SEALED Dkt. 78-11 at 425. It is bedrock law that a juror who would vote automatically to sentence a defendant to death upon conviction is not impartial. *Morgan v. Illinois*, 504 U.S. 719, 733 (1992). It is equally well settled that allowing a biased juror to be seated constitutes deficient performance, and results in prejudice, under *Strickland*. *Virgil v. Dretke*, 446 F.3d 598, 605 (5th Cir. 2006). Although the district court characterized counsel's failure to exercise either a for-cause or peremptory challenge as strategic, it cannot possibly be justified on that basis. The juror's bias was clear, and counsel's stated reasons for allowing him on the jury do not withstand even cursory scrutiny. The TCCA's rejection of the claim therefore was an unreasonable application of *Strickland*, and the district court's decision is at minimum reasonably debatable.

## A. Trial Counsel's Decision to Permit the Seating of Hakizimana Was Objectively Unreasonable.

1. The Sixth Amendment guarantees criminal defendants the right to "a fair trial by a panel of impartial, indifferent jurors." *Virgil*, 446 F.3d at 605. Failing to use a peremptory or for-cause challenge on—or, worse, *objecting* to the removal

53

of—a juror who cannot be impartial constitutes "deficient performance under *Strickland*." *Id.* at 610.

Here, juror Hakizimana stated on his questionnaire that a person who has killed "*must* be killed too," SEALED Dkt. 78-11 at 425 (emphasis added), and he reiterated that view during *voir dire*, ROA.8106 (answering "you're right" to question whether someone convicted should "always receive the death penalty"). Supreme Court precedent establishes that such a juror—one who would automatically "impose death after a finding of guilt"—is not impartial, and may be struck from the jury for cause. *Morgan*, 504 U.S. at 733. Yet defense counsel did not attempt to strike the juror for cause or through the use of a peremptory strike—and even objected when the State sought to excuse him for other reasons. ROA.8102-8104, ROA.16799, ROA.16802. Failing to strike a juror who has stated that they cannot or will not impartially consider mitigating evidence at the sentencing stage is deficient performance under *Strickland*. *See Virgil*, 446 F.3d at 610; *cf. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.10.2(B), 31 Hofstra L. Rev. 913, 1049 (2003).

**2.** The TCCA's rejection of Wells' claim was an unreasonable application of *Strickland*, and the district court's contrary conclusion is at minimum reasonably debatable. As an initial matter, the district court asserted that Hakizimana stated during *voir dire* that he could set aside his personal beliefs, ROA.1220—but over

the course of *voir dire*, he sometimes stated he could do so, but then reiterated that someone who has been convicted of murder should always receive the death penalty, ROA.8099-8101, ROA.8106-8108. And Hakizimana *never* in fact affirmed that he could or would set aside his views of the death penalty. The clear import of Hakizimana's testimony was that he could not be impartial, and the district court's contrary conclusion is at least debatable. In all events, counsel could have and should have used a peremptory strike to exclude Hakizimana. At minimum, Hakizimana had stated repeatedly that he would impose death automatically upon conviction, and his answers as a whole created substantial doubt whether he understood the proceedings. *See* pp. 6-7, *supra*.

Counsel's decision not to use a peremptory challenge cannot be characterized as a reasonable strategic decision, as trial counsel's affidavits definitively establish that they had no possible strategic basis for allowing Hakizimana on the jury.

*First*, counsel stated that they did not want to undermine their unsuccessful *Batson* challenge to the prosecution's use of peremptory strikes by themselves striking a Black juror. ROA.16799, ROA.16802. But counsel in fact used peremptory strikes to strike other African American jurors. ROA.11064-11065. Counsel also could have simply agreed to the State's attempt to strike Hakizimana, which occurred after Hakizimana had affirmed his absolutist views. ROA.8102. And in all events, a defendant's use of a peremptory challenge against an African

American venireperson has no legal preclusive effect on a potential *Batson* challenge. Counsel would have been able to explain that the challenge to Hakizimana was motivated by obvious concerns about his impartiality. ROA.11064-11065.

*Second*, trial counsel expressed concern about running out of peremptory strikes—but that does not explain their failure to agree to the State's request to dismiss him. Moreover, defense counsel concluded *voir dire* having used only eleven of their fifteen available peremptory strikes. ROA.11045, ROA.11057.

### B. Wells Was Prejudiced By Trial Counsel's Failure to Strike Hakizimana.

Wells was unquestionably prejudiced by trial counsel's failure to strike Hakizimana. This Court has held that "[b]y law," trial counsel's failure to challenge potential jurors who cannot be impartial denies the defendant an impartial jury in violation of his Sixth and Fourteenth Amendment rights, and "perforce establish[es] *Strickland* prejudice." *Virgil*, 446 F.3d at 613-14. That reasoning applies with full force here. Yet the district court did not acknowledge *Virgil*'s rule. ROA.1218-1220.

Separate and apart from *Virgil*, the record establishes that Hakizimana was in fact biased and Wells therefore suffered prejudice from counsel's unreasonable failure to strike him. Hakizimana explained in a sworn declaration submitted as part

of Wells' state habeas application, "[d]eath was the right punishment in this case. Mr. Wells killed innocent people. I believe that if you kill someone, you should be killed too. I said that in the form I filled out for jury selection. . . . I believed and still believe that Mr. Wells should get the death penalty because he killed innocent people." ROA.17388-17389. These statements—which concern Hakizimana's views of the death penalty when he filled out the questionnaire—leave no doubt that counsel's failure to challenge Hakizimana resulted in Wells' being sentenced to death.

Although the district court appears to have refused to consider that declaration based on Federal Rule of Evidence 606(b), ROA.1199, the declaration's statements do not fall within that rule's prohibition on jury testimony regarding deliberations. The declaration explains Hakizimana's views on the death penalty at the time he filled out his questionnaire, reaffirming the clear import of his *voir dire* testimony and confirming that he was in fact biased at the time he was seated on the jury; it does not purport to discuss deliberations or Hakizimana's "mental processes concerning the verdict" during trial. Fed. R. Evid. 606(b).

In sum, counsel's deficient performance resulted in the seating of a biased juror under *Morgan*, thereby necessarily causing *Strickland* prejudice. The district court's rejection of that claim is at minimum reasonably debatable.

# CONCLUSION

For the foregoing reasons, Wells respectfully asks the Court to issue a COA with respect to the claims discussed herein.

Date: May 17, 2024

Respectfully submitted,

*s/ Ginger D. Anders*

Elizabeth M. Wright
COOLEY LLP
500 Boylston St.
Boston, MA 02116
(617) 937-2300

Matthew L. Kutcher
COOLEY LLP
110 N. Wacker Dr.
Chicago, IL 60606
(312) 881-6500

Ginger D. Anders
Xiaonan April Hu
Andra Lim
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
  Suite 500E
Washington, DC 20001
(202) 220-1100
Ginger.Anders@mto.com

William S. Harris
THE LAW OFFICE OF WILLIAM S. HARRIS
604 E. 4th St., Suite 101
Fort Worth, TX 76102
(817) 718-7060

*Counsel for Petitioner-Appellant*

## CERTIFICATE OF SERVICE

I certify that on May 17, 2024, this document was served on all parties or their counsel of record through the CM/ECF system and by FedEx.

Date: May 17, 2024

Respectfully submitted,

*s/ Ginger D. Anders*
Ginger D. Anders

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,926 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman.

Date: May 17, 2024                              Respectfully submitted,

                                                          *s/ Ginger D. Anders*
                                                          Ginger D. Anders